**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| *Plaintiff,* | * | |
| v. | * | Civil No. ________________ |
| **RICHARD AKOTO, M.D.;**<br>19332 Cypress Hill Way<br>Gaithersburg, MD 20879 | *<br><br>* | |
| **RICHARD O. AKOTO, M.D., PC,**<br>7610 Carroll Ave., Suite 450<br>Takoma Park, MD 20912 | *<br><br>* | |
| *Defendants.* | * | |

* * * * * * * * * * * * * *

## COMPLAINT

The United States, by undersigned counsel, hereby files suit against Richard Akoto, M.D. and Richard O. Akoto, M.D., PC (collectively referred to as "Dr. Akoto") and alleges the following:

## INTRODUCTION

1. This is an action brought by the United States to recover damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and to recover all available damages for common law fraud, payment under mistake of fact, and unjust enrichment.

2. Between January 2019 and May 2019, Dr. Akoto falsely billed Medicare on thirty-six occasions as though he ***surgically*** implanted neurostimulator devices in his patients.

3. Unbeknownst to Medicare, Dr. Akoto did not surgically implant a single neurostimulator. Instead, Dr. Akoto, and at times his Office Manager, used adhesive to stick look-

a-like devices behind the ears of his patients. Yet, Dr. Akoto billed Medicare as if he had performed a surgery.

4. On thirty-six occasions, Medicare paid Dr. Akoto nearly $6,000.00 for each of these false claims.

5. Had it known that Dr. Akoto was fraudulently billing for his use of non-implantable devices, Medicare would not have paid Dr. Akoto ***anything***.

6. Dr. Akoto should have known that his billing was false. Instead of performing even the most perfunctory due diligence, he ignored clear Medicare guidance that clearly stated that Medicare would not pay for neurostimulators that were not surgically implanted.

7. In total, Dr. Akoto's fraudulent billing caused Medicare to falsely pay him $229,164.41.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims under 28 U.S.C. § 1367(a).

9. This Court may exercise personal jurisdiction over Dr. Akoto pursuant to 31 U.S.C. § 3732(a) because he resides and transacts business in the District of Maryland and the acts that he committed in violation of 31 U.S.C. § 3729 occurred in this District.

10. Venue is proper in the District of Maryland under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because Dr. Akoto resides and transacts business in this District.

## PARTIES

11. The United States brings this action on behalf of the United States Department of Health and Human Services ("HHS"), which administers the Medicare program via the Center for Medicare & Medicaid Services ("CMS").

12. Dr. Richard Akoto is a licensed physician in Maryland, practicing primary care and family medicine.

13. Dr. Akoto holds National Provider Identification ("NPI") Numbers 1194904078 and 1548365927.

14. He owns and operates Richard O. Akoto M.D., PA at 7610 Carroll Avenue, Suite 450, Takoma Park, MD 20912.

## LEGAL AND REGULATORY FRAMEWORK

### I. THE FALSE CLAIMS ACT

15. The False Claims Act provides, in pertinent part, that any person who: "(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States. 31 U.S.C. § 3729.

16. For purposes of the False Claims Act, the terms "knowing" and "knowingly" mean that a person: (1) has actual knowledge of the information in question; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1).

17. No proof of specific intent to defraud is required. *Id.*

18. Congress added the "reckless disregard" provision to the False Claims Act in 1986 to ensure that "knowingly" captured the "ostrich" type situation where an individual has "buried

his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted.

19. The False Claims Act imposes liability of treble damages.

20. The False Claims Act also imposes a penalty, for each individual false claim, of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Adjustment Act of 1990, 28 U.S.C. § 2461; Pub. Law No. 104-410. *See* 31 U.S.C. 3729(a).

21. Pursuant to the Bipartisan Budget Act of 2015, all civil statutory penalties, including those set forth in the False Claims Act, are required to be adjusted annually for inflation. *See* Pub. Law. No. 114-74, § 701, 129 Stat. 584, 599.

22. As a result, for any violation occurring after November 2, 2015, the False Claims Act imposes a penalty of not less than $5,000 and not more than $10,000, as adjusted by the Bipartisan Budget Act of 2015. *See* 28 C.F.R. § 85.5 (identifying civil statutory penalty amounts currently in effect, including Congressionally-mandated annual inflation adjustments).

23. Currently, the inflation-adjusted penalty for any False Claims Act violation is not less than $13,946 and not more than $27,894 per claim.

## II. THE MEDICARE PROGRAM

24. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program. Medicare is a federal health insurance program that provides coverage for individuals based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. Medicare is funded by premium payments by enrollees together with contributions from funds appropriated by the Federal Government.

25. Medicare consists of four distinct parts: A, B, C, and D. 42 U.S.C. §§ 1395c-1395i.

26. Dr. Akoto submitted claims under Medicare Part B, which covers certain medical services furnished by physicians and other suppliers and providers.[1] 42 U.S.C. § 1395k(a)(2)(B).

27. As noted above, CMS, which is part of HHS, administers the Medicare program.

28. CMS contracts with private contractors, referred to Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by healthcare providers. 42 U.S.C. §§ 1395u, 1395kk-1; 42 C.F.R. Part 421.

29. MACs generally act on behalf of CMS within a specified jurisdiction to process and pay Medicare claims submitted by health care provider.

30. At all times relevant to this Complaint, Novitas Solutions, Inc. was the MAC that administered Part B claims, including Dr. Akoto's claims, in Maryland.

31. Generally, after a provider electronically submits a claim to Novitas, the claim is paid directly to the provider without any review of supporting documents.

32. To participate in the Medicare program as a new enrollee and to be eligible to submit claims to MACs, medical providers must submit a Medicare Enrollment Application, CMS Form-855B.

33. Enrolled providers must complete a new Form CMS-855B to change their enrollment information or to reactivate, revalidate, and/or terminate Medicare enrollment.

34. A provider's authorized official must sign the "Certification Statement" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to the laws, regulations, and program instructions of the Medicare program."

---

[1] In the relevant regulations, physicians and other practitioners are generally referred to as "suppliers" in the Medicare program, rather than "providers." *See* 42 C.F.R. § 400.202. This Complaint nonetheless uses the common term "provider" to refer to individual practitioners.

35. Dr. Akoto was enrolled as a supplier in Medicare when he submitted his false claims in 2019.

36. On February 9, 2004, Dr. Akoto signed the certification statement in Section 15 of Form CMS-855B as the authorized official on behalf of his business and himself. When signing this form, Dr. Akoto agreed:

A. to abide by the applicable Medicare laws, regulations, and program instructions;

B. the Medicare laws, regulations, and program instructions are available through the Medicare contractor; and

C. payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with Medicare laws, regulations, and program instructions and on the supplier's compliance with all applicable conditions of participation in Medicare.

37. Medicare requires providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare laws, regulations, and program instructions. 42 C.F.R. § 424.516(a)(1).

38. Section 1862 of the Social Security Act, codified at 42 U.S.C. § 1395y(a)(1)(A), provides that under Medicare, "no payment may be made under part A or part B for any expenses incurred for items or services… [that] are not reasonable and necessary for the prevention of illness." When a provider submits a claim for payment to Medicare, they certify that the services both were provided as billed and are medically reasonable and necessary.

39. Similarly, under 42 C.F.R. § 411.15(k)(1) of the Medicare program regulations, any services that are not "reasonable and necessary…[f]or the diagnosis or treatment of illness or injury" are excluded from coverage.

40. To determine whether services are reasonable and necessary such that reimbursement is appropriate, Medicare requires complete documentation of services rendered to beneficiaries. *See* 42 U.S.C. §§ 1395l(e), 1395u(c)(2)(B)(i).

41. The Secretary of HHS is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. *See* 42 U.S.C. § 1395ff(a). The Secretary fulfills this responsibility both through formal rulemaking and through other forms of guidance.

42. HHS provides guidance to eligible providers pursuant to a series of Manuals, published by CMS, which are available to the public and suppliers, such as Dr. Akoto, including on the Internet. *See generally*, CMS Manuals, *available at* https://www.cms.gov/medicare/regulations-guidance/manuals (last visited Jan. 13, 2025) (hereinafter "CMS Manuals").

43. For a provider to obtain payment for services rendered from the Federal Health Care Programs, providers submit a claim form, which typically is done electronically.

44. For claims to Medicare, providers submit CMS Form 1500 and/or its electronic equivalent, known as the 837P format.

45. To submit electronic claims via the 837P format, a provider must complete and submit to CMS an Electronic Data Interchange Enrollment Form ("EDI"). The EDI may be completed by the provider or an authorized individual who has the legal authority "to commit the provider to abide by the laws, regulations, and the program instructions of Medicare." On the EDI, the provider agrees to "submit claims that are accurate, complete, and truthful" and certifies that the use of the provider's NPI on a claim "constitutes the provider's legal electronic signature and an

assurance that services were performed as billed." The provider's EDI certification then serves as the signature for every electronic claim submitted by the provider thereafter.

46. Among the information the provider includes on a CMS 1500 or the 837P electronic claim are Current Procedural Terminology Codes ("CPT codes"), CMS Healthcare Common Procedure Coding System ("HCPCS") codes, and/or modifiers to such codes. These codes are the providers' express identification of the services rendered and certification that such services are reimbursable.

47. Providing accurate CPT and HCPCS codes in claims is material to, and a condition of, payment for Medicare. *See*, *e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500, available at https://www.cms.gov/files/document/837p-cms-1500pdf.

48. Medicare regulations further explain, because "[t]he physician has a major role in determining utilization of health services furnished by providers," such as deciding on treatments, "sections 1814(a)(2) and 1835(a)(2) of the [Social Security] Act establish as a condition for Medicare payment that a physician certify the necessity of the services…." 42 C.F.R. § 424.10(a). *See also* 42 C.F.R. § 424.24(g)(1).

49. For example, when submitting the CMS 1500 to Medicare, providers certify:

A. the claim is truthful, accurate, and complete;

B. the provider familiarized themselves with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor;

C. the claim complies with all applicable Medicare laws, regulations, and program instructions for payment; and

D. the services on the claim form were medically necessary.

50. The provider also must include on the CMS 1500 form or 837P format an NPI number, which is a unique 10-digit identification number corresponding to a specific healthcare provider.

51. The claims at issue in this action were submitted by Dr. Akoto to Novitas for payment, and they identified Dr. Akoto (NPI 1194904078, 1548365927) as the billing and rendering provider.

52. A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage and reimbursement for the Medicare services it provides. *See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

53. CMS may issue National Coverage Determinations ("NCD") defining whether a particular item or service is covered by Medicare. 42 U.S.C. § 1395ff(f)(1)(B). NCDs are issued to describe the criteria and coverage limitations that apply to particular services, procedures, or devices for Medicare coverage and payment purposes. An NCD is a determination by CMS that a particular item or service is, or is not, covered by Medicare in accordance with the "reasonable and necessary" standard in section 1862(a)(1)(A) of the Social Security Act. 42 U.S.C. § 1395ff(f)(1)(B).

54. In addition to CMS issuance of NCDs, MACs may issue Local Coverage Articles that often contain coding or other guidelines. Local Coverage Articles encompass a broad class of documents primarily characterized as educational, but not to be construed as Medicare policy. Most often, these documents are Billing and Coding Articles, wherein providers are advised on how to submit their claims using proper CPT, HCPCS, and ICD-10 coding. Billing and Coding Articles are most often related to particular policy documents (NCDs or LCDs), but sometimes these educational articles can be stand-alone.

55. In addition to contracting with MACs, CMS contracts with private entities called Unified Program Integrity Contractors ("UPICs"), which perform fraud, waste, and abuse detection, deterrence, and prevention activities.

56. Throughout the relevant time period, the UPIC in this District was Safeguard Services ("SGS").

## DR. AKOTO'S FRAUDULENT CONDUCT

### I. DR. AKOTO'S FRAUDULENT BILLING FOR DEVICES THAT REQUIRED SURGICAL IMPLANTATION

57. Between January 2019 and May 2019, Dr. Akoto fraudulently billed Medicare using HCPCS Code L8679 when he used a DyAnsys Device, or a substantially similar device, on his patients.

58. The DyAnsys Device used by Dr. Akoto was referred to as a "Neurostimulator treatment with ANSiscope" or a "Drug Relief" device.

59. A picture of the DyAnsys Device, used by Dr. Akoto or his staff, is below.



60. A DyAnsys brochure found in Dr. Akoto's office describes the DyAnsys Device as "designed to be minimally invasive" and nowhere mentions surgical implantation.

61. Yet, HCPCS code L8679 is the billing code for an "implantable neurostimulator pulse generator."

62. Dr. Akoto billed HCPCS Code L8679 and was paid for his billing on 36 occasions.

63. Medicare paid a total of $229,164.41 for these 36 claims.

64. Each of Dr. Akoto's claims to Medicare for HCPCS Code L8679 was false and fraudulent.

65. For Medicare to reimburse a provider billing the L8679 code, the device used by the physician must be ***implanted*** in a patient, which requires surgery.

66. Indeed, the description of the L8679 HCPCS code itself makes clear that the code cannot be billed where a medical provider does not use an implantable neurostimulator and instead affixes with adhesive a DyAnsys Device on their patients. The code descriptor is "[i]mplantable neurostimulator, pulse generator, any type," clearly indicating that the device must be "implantable," not merely affixed with adhesive.

67. From the definition of HCPCS code L8679 alone, Dr. Akoto knew or should have known that his billing of code L8679 was false because he did not "implant" the DyAnsys Device in any of his patients. Dr. Akoto or his office manager applied the DyAnsys Devices to his patients by using adhesive, which clearly is not the same as surgical implantation.

68. In addition to the clear guidance from the description of code L8679, NCD 160.7 and Novitas Billing and Coding Article A55240 made clear that Medicare does not, and will not, cover and reimburse claims for electrical nerve stimulator devices that are non-surgically placed behind the patient's ear.

69. The DyAnsys Device used by Dr. Akoto performed "electrical nerve stimulation." For the medical use of electrical nerve stimulators to be covered and paid for by Medicare, NCD 160.7 makes clear that the electrical nerve stimulator must be implanted. The NCD states:

> Use of this stimulator involves ***implantation*** of electrodes around a selected peripheral nerve. The stimulating electrode is connected by an insulated lead to a receiver unit which is implanted under the skin at a depth not greater than 1/2 inch. Stimulation is induced by a generator connected to an antenna unit which is attached to the skin surface over the receiver unit. ***Implantation of electrodes requires surgery and usually necessitates an operating room***.

National Coverage Determination (NCD) for Electrical Nerve Stimulators (160.7), CMS Publication Number 100-3 (emphasis added).

70. This NCD was effective August 7, 1995, well before Dr. Akoto billed for his use of the DyAnsys Device.

71. In sum, the NCD issued by CMS states that for Medicare to pay for a medical provider's use of a nerve stimulator, the stimulator must be surgically implanted.

72. Neither Dr. Akoto nor his Office Manager performed surgery or used an implantable device when affixing the DyAnsys Devices on his patients, making Dr. Akoto's billing of L8679 to Medicare false.

73. Providing even more clarity, in August 2016, well before Dr. Akoto billed for his use of the DyAnsys Device, Novitas published additional guidance relating to NCD 160.7 and billing for the device used by Dr. Akoto.

74. Billing and Coding Article A55240, titled Billing and Coding: Auricular Peripheral Nerve Stimulation (Electro-Acupuncture Device), makes clear that "peripheral nerve stimulation" is ***not*** equivalent to "implantation" of a neurostimulator.

75. Billing and Coding Article A55240 states:

> It has come to Novitas' attention that auricular peripheral nerve stimulation has been billed to Medicare using the CPT code 64555. CPT code 64555 is described as: Percutaneous implantation of Neurostimulator electrode array; peripheral nerve (excludes sacral nerve) . . .
>
> The following devices are listed under the Food and Drug Administration (FDA) approval documents as electro-acupuncture devices used for stimulation of auricular acupuncture points and as such are ***non-covered***. Acupuncture for stimulation of auricular points is not a covered Medicare benefit.
>
> - NeuroStim system/NSS
> - P-Stim
> - ANSiStim
> - E-Pulse

76. Although this article is expressly directed at CPT Code 64555, which is the CPT code for the ***procedure*** where an electro-acupuncture device is surgically implanted, its guidance on billing for auricular peripheral nerve stimulation is equally applicable to HCPCS Code L8679. Article A55240 makes clear that it is improper for healthcare providers to bill for "implantable" neurostimulators when the provider is using a "peripheral nerve stimulation device," like an ANSiStim device.

77. To avoid any doubt on future billing for these types of devices, the Article makes clear that it applies to medical providers who use the same or similar devices in the future.

78. Despite this clear guidance, Dr. Akoto falsely and fraudulently billed Medicare $9,000 on 36 separate occasions in 2019 as though he surgically implanted a neurostimulator, when in fact he used a non-covered peripheral nerve stimulation device.

79. Dr. Akoto's billing to L8679 in 2019 occurred despite the clear language of Code L8679 and guidance from Medicare about billing for the type of device he used: billing Medicare for the use of a surgically implanted neurostimulator was improper when the medical provider actually used adhesive to affix on patients an auricular peripheral nerve stimulation device.

80. Dr. Akoto willfully ignored the clear and consistent guidance provided by Medicare and its contractors regarding when it was appropriate to bill L8679.

## II. Dr. Akoto's Specific False Claims to Medicare

81. From January 17, 2019 to May 6, 2019, Dr. Akoto falsely submitted 36 claims to Medicare for reimbursement for HCPCS Code L8679.

82. For each of these 36 claims, Dr. Akoto fraudulently sought $9,000 in reimbursement from Medicare.

83. Medicare paid between $6,300 and $6,400 per claim for 36 of Dr. Akoto's false L8679 claims, totaling $229,164.41.

84. Dr. Akoto knew these claims were false because Dr. Akoto did not perform surgery to implant a neurostimulator.

85. For example, Dr. Akoto billed HCPCS Code L8679 to Medicare for services performed on Medicare beneficiary E.P. On February 14, 2019, Dr. Akoto saw E.P. for a "complaint of chronic lower back pain."

86. Dr. Akoto's medical record of this visit indicates that he advised E.P. "to consider the placement of [sic] auricular neurostimulator for the treatment of her chronic lower back pain and fibromyalgia."

87. Dr. Akoto's note indicates he performed a procedure and billed to "L8679 – Implantable Neurostimulator."

88. Dr. Akoto explained that the "postauricular region of the right ear was prepared . . . [and] the percutaneous neurostimulator was adhered to the skin."

89. Dr. Akoto explained that he used the *[sic]* "DyAnysys" device for this procedure.

90. Dr. Akoto also documented that he used the "DyAnysys ANSiStim locator *[sic]* devise."

91. He further noted that the device was "covered with an adhesive band-aid."

92. On the same date, February 14, 2019, Dr. Akoto billed Medicare $9,000.00 using the L8679 code.

93. Medicare paid Dr. Akoto $6,378.27 for this false February 14, 2019 billing related to patient E.P.

94. As is clear from Dr. Akoto's medical records, there was no surgery performed on E.P. when Dr. Akoto billed to L8679.

95. E.P. simply had the DyAnsys Device placed with adhesive behind her ear.

96. And Dr. Akoto did not perform the procedure – a male assistant in Dr. Akoto's office did.

97. Unlike a surgically implanted device, E.P. removed the DyAnsys Device by herself at home within three-to-four days of its placement.

98. Dr. Akoto did not surgically implant a device in E.P., making his billing to L8679 for E.P. fraudulent.

99. Also indicating falsity, Dr. Akoto's records make clear that he used an "ANSiStim" device on E.P. As explained above, Billing and Coding Article A55240 listed the types of devices that were not covered by Medicare. "ANSiStim" is clearly listed as a non-covered device, further illustrating that Dr. Akoto's billing related to patient E.P. was false.

100. For these reasons, among others, Dr. Akoto's billing to L8679 for E.P. was fraudulent.

101. As another example, Dr. Akoto billed HCPCS Code L8679 to Medicare for services performed on Medicare beneficiary E.V.

102. On April 16, 2019, Dr. Akoto saw E.V. for a "complaint of chronic neck and upper back pain that radiates to the right shoulder." Dr. Akoto noted that E.V.'s symptoms "first appeared about 8 years ago."

103. Dr. Akoto's medical record of this visit indicates he performed a procedure and billed to "L8679 – Implantable Neurostimulator."

104. Dr. Akoto explained that the "postauricular region of the right ear was prepared . . . [and] the percutaneous neurostimulator was adhered to the skin."

105. Dr. Akoto explained that he used the *[sic]* "DyAnysys" device for this procedure.

106. Dr. Akoto also documented that he used the "DyAnysys ANSiStim locator *[sic]* devise."

107. He further noted "needles were inserted" and that the device was "covered with an adhesive band-aid."

108. On the next day, April 17, 2019, Dr. Akoto billed Medicare $9,000.00 using the L8679 code.

109. Medicare paid Dr. Akoto $6,378.27 for his April 17, 2019 billing to code L8679.

110. As is clear from Dr. Akoto's medical records, E.V. simply had the DyAnsys Device placed with adhesive behind her ear.

111. No surgery was performed on E.V.

112. Further still, Dr. Akoto did not perform the procedure – a different person in the office, presumably staff, performed the procedure.

113. Unlike a surgically implanted device, E.V. removed the DyAnsys Device by herself, the same day it was applied in Dr. Akoto's office, because it was bothering her.

114. Dr. Akoto did not surgically implant a device in E.V., making his billing to L8679 for E.V. fraudulent.

115. Also indicating falsity, Dr. Akoto's records make clear that he used an "ANSiStim" device on E.V. As explained above, Billing and Coding Article A55240 listed the types of devices that were not covered by Medicare. "ANSiStim" is clearly listed as a non-covered device, meaning Dr. Akoto should not have billed $9,000 as though he used a covered device.

116. Much like his billing for E.P. and E.V., each time that he billed L8679 to Medicare, Dr. Akoto did not surgically implant a neurostimulator in his patients. Instead, Dr. Akoto used adhesive to stick a DyAnsys Device behind his patients' ears.

117. In total, Dr. Akoto submitted 36 false claims to Medicare for reimbursement for his use of the DyAnsys Devices using HCPCS Code L8679. Those claims are reflected in the attached **Exhibit 1**, depicting the patient's initials, date of service, amount billed by Dr. Akoto, and amount Medicare paid to Dr. Akoto.

118. Dr. Akoto was improperly paid by Medicare a total of $229,164.41 for these 36 false claims.

**COUNT I**
**(FCA: Presentation of False Claims)**
**(31 U.S.C. § 3729 (a)(1)(A))**

119. The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

120. As detailed above, Defendant Dr. Akoto knowingly presented or caused to be presented materially false and fraudulent claims for payment or approval to the United States because they were for services that Medicare does not reimburse.

121. Dr. Akoto's conduct – billing $9,000.00 as though he performed a surgery when he simply used adhesive to stick an electro-acupuncture device behind his patients' ears – was and is material to Medicare. Had it known that Dr. Akoto was not performing surgical procedures, Medicare would not have paid anything to Dr. Akoto for his use of the DyAnsys Devices.

122. Medicare paid 36 claims that Dr. Akoto submitted for his use of the DyAnsys Device, for a total of $229,164.41.

123. By virtue of the false or fraudulent claims Dr. Akoto made or caused to be made, the United States suffered damages, and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus civil penalties of not less than $13,946 and not more than $27,894 for each violation. *See* 28 C.F.R. § 85.5.

**COUNT II**
**(False Claims Act: Using False Statements Material to False Claims)**
**(31 U.S.C. § 3729(a)(1)(B))**

124. The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

125. As detailed above, Dr. Akoto made, used, or caused to be made or used, false records or statements material to false claims.

126. Such false records or statements included, but are not limited to, the false certifications on Forms CMS 1500, as well as the EDI enrollment and applications, to obtain approval for and payment by the United States for false or fraudulent claims.

127. Dr. Akoto's false certifications and representations he made or caused to be made were material to the payment of the false claims by the United States.

128. Dr. Akoto's false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

129. By virtue of the false or fraudulent statements or records Dr. Akoto made or caused to be made, the United States suffered damages, and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus civil penalties of not less than $13,946 and not more than $27,894 for each violation. *See* 28 C.F.R. § 85.5.

**COUNT III**
**(Common Law Fraud)**

130. The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

131. During the relevant time period, Defendant Dr. Akoto presented, or caused to be presented, materially false and fraudulent claims for payment or approval to the United States.

132. Specifically, Dr. Akoto submitted, or caused to be submitted, claims to Medicare under HCPCS code L8679 and received reimbursement despite the fact that the services rendered to patients (a) did not qualify for that code because there was no implantation of any device; and (b) were not reimbursable at all.

133. Dr. Akoto presented these claims with the intent to deceive and induce the United States into paying these claims.

134. The United States relied on the materially false representations made by Dr. Akoto and acted in reliance upon the same, including payment of claims to Dr. Akoto to which he was not entitled.

135. Because of the Dr. Akoto's actions, the United States sustained damages in an amount to be determined at trial, and, as a result, the United States is entitled to compensatory damages consisting of the total amount paid as a result of the fraudulent claims, plus interest and other compensatory or punitive damages to be determined at trial.

**COUNT IV**
**(Payment by Mistake)**

136. The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

137. The United States claims the recovery of all monies by which Dr. Akoto has been paid by mistake.

138. Because of the acts set forth above, Dr. Akoto was paid by mistake at the expense of the United States in an amount to be determined at trial, which, under the circumstances, in equity and good conscience, should be returned to the United States.

**COUNT V**
**(Unjust Enrichment)**

139. The United States repeats and re-alleges the above paragraphs as if fully set forth herein.

140. The United States claims the recovery of all monies by which Dr. Akoto has been unjustly enriched. Specifically, Dr. Akoto claimed, received, and retained the benefit of federal money from the Medicare program, intended as reimbursement for legitimately implanted neurostimulators that would have been appropriately billed under code L8679, although the services provided by Dr. Akoto were not reimbursable under that code (or at all).

141. Dr. Akoto has been unjustly enriched with money from the United States, which he should not in equity and good conscience be permitted to retain. The United States is entitled to the return of all payments made by Medicare where Dr. Akoto improperly billed to code L8679.

**PRAYER FOR RELIEF**

Wherefore, the United States demands that judgment be entered in its favor and against Dr. Akoto as follows:

1) On Count I under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and the maximum civil penalties as are required by law, together with all such further relief as may be just and proper.

2) On Count II under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and the maximum civil penalties as are required by law, together with all such further relief as may be just and proper.

3) On Count III for common law fraud, the damages sustained by the United States plus interest, costs, expenses, and other compensatory or punitive damages to be determined at trial, together with all such further relief as may be just and proper.

4) On Count IV for payment by mistake, for the damages sustained and/or amounts by which Dr. Akoto was paid by mistake or by which Dr. Akoto retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

5) On Count V for unjust enrichment, for the damages sustained and/or amounts by which Dr. Akoto was unjustly enriched or by which Dr. Akoto retained illegally obtained monies, plus pre-judgment and post-judgment interest, costs, and expenses, and for all such further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

Respectfully submitted,

Erek L. Barron
United States Attorney

Digitally signed by MATTHEW HAVEN
Date: 2025.01.15 13:04:58 -05'00'

Matthew A. Haven
Assistant U.S. Attorney
U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
(410) 209-4800